Anderson C. **LYONS**

v.

**HOLSTON DEFENSE CORPORATION**
and United States Fidelity &
Guaranty Company.
**Civ. A. No. 985.**

United States District Court
E. D. Tennessee, Northeastern Division.
June 18, 1956.

Cox, Epps, Powell & Weller, Johnson City, Tenn., for plaintiff.

Wilson & Worley, Kingsport, Tenn., for defendants.

ROBERT L. TAYLOR, District Judge.

This is an action to recover benefits provided for total permanent disability by the Compensation Law of Tennessee, particularly sec. 6852(d), which makes certain occupational diseases compensable. Benzol poisoning, from which plaintiff claims to be suffering, is one of the listed diseases for which compensation is provided. Technical defenses of lack of notice and failure to commence timely suit, where not abandoned, are untenable for lack of factual support. Prior employment as a cause of plaintiff's illness is likewise excluded. Fully sustained is plaintiff's allegation of total permanent disability. There remains to be examined the question whether plaintiff is suffering from benzol poisoning that is causally connected with his employment.

Plaintiff began his last period of employment with defendant Holston Defense Corporation September 6, 1952, and continued in that employment until March 27, 1954. He is now forty-one years of age. Late in 1952 he was transferred into the room where he worked with materials which he claims caused his illness. Those materials were chemical compounds known in the explosives field as TNT and RDX. In this room plaintiff was a kettle operator, his contacts being with two kettles, one for TNT

and one for a mixture of TNT and RDX. For each run a quantity of TNT was placed in a kettle where it was heated. The liquified TNT was then siphoned into the next kettle, where plaintiff shoveled into it a quantity of RDX. This mixture was heated to a temperature of 105 degrees Centigrade, the result being a new composition, its nature not here material.

In the course of a day, plaintiff heated and otherwise processed 10 kettles of material. During the processing, fumes escaped from the chemicals into the room where he worked, such escape being most pronounced when it was necessary for plaintiff to remove the lid from the kettle in order to take the temperature of its contents. A striking indication of the escape of fumes was the effect on plaintiff's clothing. He wore a white uniform which began as a clean one each day. By the end of a day the uniform had become discolored, changing from white to brown or reddish brown. This daily exposure to fumes of varying concentration continued for a period of one and one-half years.

Escaping fumes of a character here material were either those of toluene or those from TNT, or both. They escaped either while the TNT was being separately heated, or while it was being heated with RDX added, or during both stages of the processing. That plaintiff inhaled the fumes and was otherwise exposed to them is certain. That those fumes resulted in benzol poisoning is not so certain. Certain highly significant facts, however, are to be noted. First, that by all of the expert testimony the fumes of toluene and of TNT are toxic. Second, that by the more convincing and acceptable testimony plaintiff was daily exposed to the fumes for one and one-half years. Third, that plaintiff during that period of exposure developed the disabling disease of which he complains. Two alleged facts whose establishment must be found as a basis of relief are, first, that the disease is benzol poisoning and, second, that causal connection existed between the disease and the aforesaid exposures.

Benzol is a comprehensive term which includes the volatile products of coal, their elements being hydrogen and carbon. These compounds, conveniently known as hydrocarbons, vary in chemical composition, each hydrocarbon compound having its own popular designation, such as benzene and toluene. Fumes from these coal-tar hydrocarbons are poisonous in varying degrees.

That member of the benzol family of importance here is toluene. It is used in the manufacture of TNT, an explosive, the process being referred to by the experts as nitration. In the process, the hydrocarbon toluene enters into chemical combination with a compound containing nitrogen. An example of such compound is nitric acid, which contains in its molecule hydrogen, nitrogen and oxygen atoms. The end product sought in the combination of the hydrocarbon with the nitrogen compound is TNT, or trinitrotoluene.

Where the separate compounds are chemically pure and in the correct quantities needed to produce trinitrotoluene, the combining process results in complete chemical reaction. That is, no residual products are to be found. Where the reaction is not complete, the TNT contains residual products which may be either excess toluene or an excess nitrogen compound. To obtain pure TNT in such circumstances, the residual is removed by a process of "washing."

At Holston Defense Corporation's plant where plaintiff worked TNT was not produced, but was obtained from an outside source. Tests were made to determine its degree of chemical purity, or fitness for use in combination with RDX. It does not appear that absolute purity was required, the tests being to determine whether the TNT met the required standard of purity. Impurity in the TNT could have been residual nitrates, residual toluene, or residue caused by impurities in the nitrates or in the toluene used to make the TNT. Toluene itself is volatile. Accordingly, any excess of toluene in the TNT that was joined to RDX could have vaporized during the kettling

process and been inhaled by plaintiff. There was no chemical decomposition of TNT during the heating process, or kettling, such as would have separated the toluene from the nitrate and thus put toluene fumes in the air from this additional source. However, TNT itself has some volatility with the result that TNT fumes escaped from the kettles. TNT fumes, like those of toluene, are toxic.

TNT is not a hydrocarbon, though it is produced by chemical reaction in which a hydrocarbon is involved. Inhalation of TNT fumes is not the inhalation of toluene or of any other member of the benzol family. The toluene disappeared when it entered into combination with the nitrate to produce an entirely new and different substance. The experts testified that though TNT would produce fumes under heat it would not decompose, or return to its original separate compounds. Nor would it break up into new and different compounds. Whether the fumes of TNT would undergo chemical decomposition within the human body was left unanswered. Indeed, the question was not asked. No expert in the field of biochemistry was called to testify. Whether chemicals within the body will take the toluene components from TNT, or take the nitrate components and leave the toluene, or whether they will enter into combination with trinitrotoluene to form a new and more injurious compound, are other unanswered questions. It is certain, however, that a compound was taken into the body which contained the atoms of toluene and that the compound which contained toluene as one of its ingredients was a toxic compound.

The experts were in disagreement as to the effects of toluene fumes, particularly as to the locale of injurious effects. Those who testified for defendant were positive that any injurious effects would appear in the blood-producing parts of the body. One localization would be in the bone marrow. Another would be in the liver. Injury to the body externally would be in the form of dermatitis. Effects on the blood would be reduction of hemoglobin, the number of blood cells, and the ability of the blood to clot.

The blood symptom of plaintiff appeared in the urine and the doctors who made exhaustive tests and study of plaintiff's case localized the trouble as being in the kidneys. Adverse medical witnesses, though admitting that benzol poisoning could work havoc in other parts of the body, upon the blood-producing tissues and upon the blood itself, dismissed kidney injury from benzol as unheard of and regarded plaintiff's blood loss through the kidneys as a coincidence wholly unrelated to his inhalation of tissue-destroying fumes.

On the other hand, the doctor who made the most thorough study of plaintiff's case eliminated by exhaustive tests every kidney disease familiar to medical science that is associated with bleeding. This, then, is the question posed for defendant's experts: If it is not benzol poisoning, what is it? Those experts do not know what it is, but they are absolutely certain that it is not benzol poisoning. The one doctor who exhausted every resource he knew in an effort to determine the cause of plaintiff's affliction diagnosed it as a probability of benzol poisoning.

A college professor of chemistry testified that he was familiar with the chemical and physical processes involved in the making of TNT. He testified that in the kettling process used by defendant there would be exposure to toluene fumes by an employee doing the work which plaintiff did. That there would be exposure, also, to TNT fumes is hardly open to question, being admitted by most of the witnesses.

Early in 1954, plaintiff began to have cramps in a locality he described as the lower part of his stomach which, incidentally, could also have been in the vicinity of the liver. In February of 1954, he began to have bleeding of the kidneys. He continued to work until March 27, 1954, from which time he has been unable to work. From that date onward his history has been one of hospitalization and other recourse and endeavor to find a cure for his affliction. His disability is total and permanent.

■ In a situation of this kind the course to be pursued has been well charted. Where the experts disagree as to whether the employee's sickness is due to the exposures complained of and the true cause of his illness is not shown by the employer's witnesses, the presumptions as to cause should be resolved in favor of the employee. Milstead v. Kaylor, 186 Tenn. 642, 212 S.W.2d 610; Tapp v. Tapp, 192 Tenn. 1, 236 S.W.2d 977; see, also, Howell v. Charles H. Bacon Co., D.C., 98 F.Supp. 567, affirmed, 6 Cir., 197 F.2d 333.

While the employee has the burden of proving causal connection between the disease and the conditions of his employment, absolute certainty as to cause is not required. Great American Indem. Co. v. Friddell, 6 Cir., 280 S.W.2d 908. In the Court's opinion there is ample affirmative proof in support of the doctor's diagnosis of "probability" to warrant as a reasonable inference the conclusion that plaintiff is afflicted and disabled as a result of benzol poisoning causally connected with exposures in his employment. See Lynch v. La Rue, 6 Cir., 278 S.W.2d 85. Accordingly, plaintiff is entitled to the compensation and medical benefits provided for cases of total permanent disability.

Let the necessary order be prepared.